Fred ISAACS, Appellant,

v.

UNITED STATES of America, Appellee.

Harry H. ISAACS, Appellant,

v.

UNITED STATES of America, Appellee.

Fred A. OSSANNA, Appellant,

v.

UNITED STATES of America, Appellee.

Benson M. LARRICK, Appellant,

v.

UNITED STATES of America, Appellee.

Earl A. JEFFORDS, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 16655, 16656, 16662, 16663, 16669.

United States Court of Appeals Eighth Circuit.

March 22, 1962.

Rehearing Denied April 20, 1962.

---

Melvin H. Siegel, Minneapolis, Minn., for Fred and Harry H. Isaacs. Leonard, Street & Deinard and Gary J. Meyer, Minneapolis, Minn., were with him on the brief.

S. P. Gislason, New Ulm, Minn., for Fred A. Ossanna and Ray G. Moonan, Minneapolis, Minn., was with him on the brief.

Robert J. King, Minneapolis, Minn., for Benson M. Larrick and Hvass, Weisman & King, Minneapolis, Minn., were with him on the brief.

Harry H. Peterson, Minneapolis, Minn., for Earl A. Jeffords, and Donald K. Smith, Minneapolis, Minn., was with him on the brief.

Hyam Segell, Sp. Asst. to the Atty. Gen., for appellees and Miles W. Lord, U. S. Atty., Minneapolis, Minn., was with him on the brief.

Before JOHNSEN, Chief Judge, and VAN OOSTERHOUT and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

Appellants Fred A. Ossanna, Benson M. Larrick and Harry H. Isaacs were found guilty by a jury of mail and wire fraud violations, transporting property fraudulently obtained in interstate commerce and of a conspiracy to commit offenses against the United States; appellants Fred Isaacs and Earl A. Jeffords were found guilty of a conspiracy. The trial took place in the United States District Court, District of Minnesota, Fourth Division, with the Honorable Gunnar H. Nordbye presiding. Judgments of convictions were entered on the jury's verdicts. Separate appeals have been taken but all appeals will be disposed of in one opinion.

Preliminarily, a brief résumé of the background and the factual situation forming the genesis of the prosecution will be of assistance to a clearer understanding of the issues presented on appeal.

The Twin City Rapid Transit Company was the parent company of the following subsidiaries: Minneapolis Street Railway Company, the St. Paul City Railway Company, the Minneapolis and St. Paul Suburban Railroad Company, Twin City Motor Bus Company, the Minnetonka and White Bear Navigation Company, the Rapid Transit Real Estate Corporation, and the Transit Supply Company.[1]

The parent company was established in 1891, its stocks and securities have been listed on the New York Stock Exchange since 1895, and its approximately 450,000 shares of common stock are held by approximately 3,000 shareholders situated throughout the United States and Canada.

Prior to January 1, 1950, the Company operated an electric street railway system over approximately 430 miles of street railway lines in the Twin City area of Minneapolis and St. Paul, Minnesota, and the suburbs thereof. The Company generated and distributed the electricity necessary in the operation of the system. It owned power plants where electricity was generated, electrically operated

1. The parties in the numerous briefs have generally referred to the parent company and its subsidiaries as either TCRT or Transit Companies. Since all are regarded for the purpose of these cases as one company, we shall, in the interest of brevity, unless otherwise designated, refer to the parent company and its subsidiaries as the Company.

streetcars, an overhead system of cables, trolley wires and poles, the track system of steel rails, streetcar barns, real estate and an underground transmission system, consisting of copper wires encased in lead cables laid in tunnels which generally followed street patterns throughout the Twin City area.

Before 1949 the Company's management was under the presidency of D. J. Strouse. One Charles Green, a substantial shareholder in the Company, was elected president of the Company in November, 1949. Fred A. Ossanna, one of the appellants herein, was then appointed general counsel of the Company.

Green's duration as president was short-lived. Apparently because of procedures he employed strife developed among members of the board of directors, with Ossanna becoming the head of one faction and Green leading the other faction. Ossanna organized a stockholders' committee and conducted a proxy campaign which brought about the ouster of Green. He was replaced by Emil B. Aslesan, who served from March, 1951, to September, 1951, when Ossanna became president.

The Ossanna administration embarked upon a program of rapid conversion from streetcars to busses. This program caused a vast amount of property previously utilized in the operation of the street railway system to become surplus, and these prosecutions are based upon the procedures employed in the disposition of the surplus property or in connection with such disposition.

A brief statement of the occupation of the parties and their relationship, if any, to the Company should be made before other aspects of the trial proceedings are considered.

Fred A. Ossanna has been a lawyer since 1921 and prior to becoming associated with the Company, practiced his profession in Minnesota; at the time he organized the stockholders' committee in 1951, Ossanna was the direct and beneficial owner of 200 shares of the preferred stock and 11,500 shares of the common stock of the Company. He was president of the Company during the period of the alleged violations.

James H. Towey became a member of the board of directors with the advent of the Ossanna administration, and was secretary and treasurer of the Company during the period of the alleged violations. For a brief period of time he was in charge of the scrap program. He was a member of the Ossanna stockholders' committee organized for the proxy campaign and owned 170 shares of preferred and 5,700 shares of the common stock of the Company.

Benson M. Larrick with prior experience in the maintenance and operation of busses, was employed by the Company in 1952 and was placed in charge of the scrap resulting from the conversion. Larrick was made a director in 1954 and remained with the Company until 1957. During this period he was general manager, vice-president and assistant to the president.

Isadore Blumenfield, although not a member of the stockholders' committee referred to, was the real owner of a substantial number of shares of stock of the Company. He was a friend and close business associate of Ossanna.

Harry H. Isaacs was president of American Iron & Supply Company (American Iron), which acquired the greater portion of the overhead and underground scrap and salvage from the Company, and is also a partner in American Salvage & Supply Company. (Other partners were Fred Isaacs and Theodore Landy). Harry Isaacs was also a partner in Mid-Continent Development and Construction Company which also acquired certain real estate and scrap from the Company. (There were five other partners including Isadore Blumenfield and his attorney, Robert Levitt).

Earl A. Jeffords was a realtor doing business as J & C Holding Company. He was the owner of 500 shares of the common stock of the Company at the time the stockholders' committee was organized and functioned, and was a member of that committee.

Fred Isaacs, the son of Harry H. Isaacs, was secretary of American Iron and partner in the American Salvage & Supply Company; he actively participated in the acquisition of the overhead and underground surplus scrap acquired from the Company.

In this setting we proceed to consideration of the indictments upon which appellants were tried, and other formal proceedings in the trial court.

The indictments are lengthy, but may be summarized as follows: Indictment No. 4–59–CR. 77, returned September 18, 1959, was in 17 counts, and named as defendants the appellants Ossanna, Larrick, Harry Isaacs, and Jeffords, and also James H. Towey and Isadore Blumenfield.[2] Within this indictment, four separate statutory offenses were charged, to wit: use of mails to execute a scheme to defraud (18 U.S.C.A. § 1341);[3] use of wire communication in furtherance of a scheme to defraud (18 U.S.C.A. § 1343);[4] transportation in interstate commerce of goods knowingly converted or taken by fraud (18 U.S.C.A. § 2314);[5] and conspiracy to commit an offense against the United States (18 U.S.C.A. § 371).[6] As may be seen, each of these offenses depends directly (or in the case of § 371, perhaps indirectly) upon the presence of a scheme to defraud. In Count I of this indictment, the scheme was described in detail—there it was alleged that all of the named defendants (save Jeffords) were participants in "a

scheme and artifice to defraud (the Transit Company) and the stockholders * * of real and personal property, and for obtaining for themselves and others not entitled thereto money and properties by means of false and fraudulent pretenses, representations, and promises." For the purpose of later discussion, it is important to bear in mind that this *"overall scheme"* is the keynote and common thread running throughout the separate counts, and it is this scheme—"to loot the Transit Companies"—that serves to bind appellants together in guilt. After recital of the fraudulent scheme generally, as quoted above, Count I of the indictment then proceeded to recite some 17 transactions alleged to be "a part of said scheme and artifice." For the sake of brevity, these transactions have been characterized in trial and in the briefs under five headings: 1) fraud in dispositions of scrap and salvage; 2) fraud in sale of Mexican notes; 3) fraud in sale of the Hopkins Right-of-Way; 4) fraud as to commissions paid to defendant Jeffords; and 5) fraudulent transactions involving sale of lots to defendant Towey. It is important to note at this point that all of these transactions involved dispositions of Company assets.

This preliminary recital of the "overall scheme" and parts thereof, was realleged in each of the subsequent mail fraud and fraud by wire counts. Counts I through XIII were based upon the "mail fraud," or "wire fraud" statutes, each alleging mail or wire com-

---

2. The date of docketing appeals of the respective appellants governs and accounts for the order in which appellants' names appear in the records of this Court.

3. "Whoever, having devised or intending to devise any scheme or artifice to defraud, * * * for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter * * * to be sent or delivered by the Post Office Department, * * * shall be fined * * *."

4. "Whoever, having devised or intending to devise any scheme or artifice to defraud, * * * transmits or causes to be transmitted by means of wire, radio, or

television communication in interstate * * * commerce, any writings, * * * for the purpose of executing such scheme or artifice, shall be fined * * *."

5. "Whoever transports in interstate * * commerce any goods, * * * of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

6. "If two or more persons conspire * * to commit any offense against the United States, * * * and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 * * *."

munications upon separate stated dates. Counts I through III covered the sending of incomplete and misleading annual reports on Company affairs (concealing transactions as to surplus salvage and scrap), and the defendants Ossanna, Larrick and Harry Isaacs were found guilty on these charges; Counts V and VI covered letters involving disposition of scrap and salvage, and defendants Ossanna, Larrick and Harry Isaacs were found guilty on these counts. Counts VII, VIII and IX were directed to communications concerning the Mexican notes, and defendants Ossanna and Larrick were found guilty, and defendant Harry Isaacs, *not guilty* on these three counts. Counts XIV, XV and XVI also directed to transactions with scrap lead and cable, charged violations of 18 U.S.C.A. § 2314 (interstate transportation of fraudulently obtained property) through transportation on three separate dates of scrap and cable from Minnesota to points in Illinois and Nebraska, but it was not alleged these shipments were made as part of the overall scheme. The jury found defendants Ossanna, Larrick and Harry Isaacs guilty on these three counts.

Count XVII was the conspiracy count, whereby it was charged that the defendants Ossanna, Towey, Larrick, Blumenfield, Harry Isaacs and Jeffords, conspired together, and with one George A. Francis, one James B. Aune, and one Walter N. Carlson (not named as defendants), and others unknown, to commit offenses against the United States (18 U.S.C.A. § 371)—to wit: violations of the wire fraud, mail fraud, and interstate transportation of property statutes, as condemned in the preceding counts. A total of 39 overt acts were alleged which, generally speaking, covered the various transactions alleged in the substantive counts. The jury found defendants Ossanna, Larrick, Harry Isaacs and Jeffords guilty as charged under this count.

The defendant Towey, named as a defendant under the foregoing 17 counts, was not tried with the other defendants due to illness. The trial court directed a judgment of acquittal as to defendant Blumenfield on Counts XIV, XV and XVI (transportation of scrap), and the jury found defendant Blumenfield not guilty on all of the remaining counts tried. The jury also found defendants Ossanna, Larrick and Harry Isaacs not guilty as to Count XII, which involved commissions paid to a certain Paul Villaume.[7]

The appellant Fred Isaacs is before us by reason of his conviction under a second indictment, being No. 4–60–CR. 13. There, Fred Isaacs, and one Theodore Landy were named as defendants, charged with violation of the conspiracy section (18 U.S.C.A. § 371). Generally speaking, this indictment was identical with Count XVII of Indictment No. 77, with some additional overt acts alleged, particularly with regard to alteration of weight tickets. The trial court directed a judgment of acquittal as to the defendant Landy, and the jury found defendant Fred Isaacs guilty as charged.[8]

After meticulous consideration by the trial court of every contention and claim of error asserted, appellants' after trial motions for judgments of acquittal, or in the alternative, for new trials, were denied. Ossanna was given a general sentence of four years, and a committed fine of $1,000 on his convictions under Counts I, II, III, V, VI, VII, VIII and IX, and an additional four years, to be served concurrently, and a committed fine of $10,000, covering his convictions on Counts XIV, XV, XVI and XVII. Harry Isaacs was given a general sentence of four years and a committed fine of $1,000 on his convictions under Counts I, II, III, V and VI, and an additional general sentence of four years, to be served concurrently, and a committed fine of $10,000 upon his convictions under Counts XIV, XV, XVI and XVII. Appellant Larrick

---

**7.** The trial court dismissed Counts IV, X, XI and XIII of indictment No. 4–59–CR. 77 prior to submission to the jury.

**8.** A third indictment, being No. 4–59–CR. 78, was dismissed by the court pursuant to motions of defendants.

was given a general sentence of two years and a committed fine of $1,000 under Counts I, II, III, V, VI, VII, VIII and IX, and a general sentence of two years, to be served concurrently, and a committed fine of $2,000 on the remaining counts. Jeffords received a sentence of 18 months and a committed fine of $1,-500, and Fred Isaacs was sentenced for a period of one year and one day, and given a committed fine of $2,500. Additionally, appellants Ossanna and Harry Isaacs were each ordered to pay one-half of the costs of prosecution.

■ Common to all of the appellants is the broad contention properly preserved and protected by the record, that, as a matter of law, the evidence was insufficient to sustain the verdicts and the judgments entered thereon. It should be pointed out, however, that no question is raised or presented as to the sufficiency of the evidence to establish that the mails and wire were used for the purpose of executing the scheme to defraud. The sufficiency of evidence contention is focused upon two key issues: one, whether there was *fraud practiced* in the disposition of the Company's property to its loss and detriment; and two, was such fraud the result of a single, overall scheme and plan as contended by the Government, or were there a number of independent, isolated and unrelated schemes to defraud as urged by the appellants. The contention of the appellants requires a rather detailed review of the evidence; however, such review will be in the light most favorable to the Government because our chief concern is not whether there was evidence from which the jury could have acquitted the appellants but whether there was substantial evidence to sustain the jury's finding of fraud and the existence of an overall scheme to defraud as alleged in the indictments. Of course, as was pointed out by the trial court, if each appellant was privately engaged in his own bit of fraud and there was no common scheme, then appellants would prevail, for the convictions depended upon proof of joint action and a common purpose.

The scope, magnitude and extent of our task may be appreciated in light of the fact that the trial commenced on April 18, 1960, and proceeded without undue interruption to August 6, 1960, when verdicts were returned; that 150 witnesses testified; that the exhibits are many and voluminous and that 72 volumes of transcript of more than 11,000 pages have been filed as the record; [9] that the court's charge, following extensive argument by counsel for defendants [10] was so comprehensive and exhaustive that the entire day of August 1, 1960 (from 9:30 a. m. to 5:30 p. m.) was required and consumed in delivering the same, and that the jury deliberated without interruption until August 6, 1960, when the verdicts were returned.[11] Interestingly enough, the principal dispute between the Government and appellants stems not from a disagreement as to the pertinent facts and circumstances, but rather from the conclusions and interpretations to be drawn therefrom.

Preliminarily we recognize that the forms of fraud are as multifarious as human ingenuity can devise; that courts consider it difficult, if not impossible, to formulate an exact, definite and all-inclusive definition thereof; and that each case must be determined on its own facts. In general, and in its generic sense, fraud comprises all acts, conduct, omissions and concealment involving breach of a legal or equitable duty and resulting in damage to another. 37 C.J.S. Fraud § 1. For various definitions of fraud found

9. Although numerous witnesses and exhibits were offered on behalf of defendants, none of them personally testified.

10. Harry and Fred Isaacs were represented by the same counsel, and each of the remaining defendants was represented by counsel of his own selection.

11. Pursuant to our Rule 8(i) we have reviewed this case upon the original papers and the typewritten transcript of the evidence and proceedings at trial.

in pronouncements by the courts, see 23 Am.Jur. Fraud and Deceit, § 2.

### SCRAP TRANSACTIONS

■ A large portion of the trial was consumed in developing the methods and procedures adopted in the disposition of scrap property, having a very substantial value. This property has been placed in several categories referred to as "track and overhead scrap," "miscellaneous scrap" and "underground cable." Shortly after the Ossanna group assumed control of the Company, Towey was placed in charge of the sale of scrap. He was relieved of this responsibility and was replaced by Larrick, when the latter was employed by the Company, and thereafter the bulk of the scrap transactions was under the control and domination of Ossanna and Larrick as representatives of the Company, and Harry Isaacs and Fred Isaacs on behalf of American Iron, the recipient of the major portion of the scrap.

We have reviewed the entire record with painstaking care and have no difficulty in reaching the conclusion that there was substantial evidence from which the jury could find that the course pursued in disposing of the scrap was permeated with fraud. Indeed, counsel for the Isaacses, with commendable frankness, stated in oral argument before this Court: "[A]nd may I say preliminarily, speaking for the appellants that I represent, Fred Isaacs and Harry Isaacs, we raise no question as to the sufficiency of the evidence to sustain a finding of fraud as to the separate transaction in which they engaged, the scrap transaction, had they been separately alleged and separately tried rather than alleged as a part of a single overall scheme or conspiracy." [12]

There were numerous devices and devious methods employed to effectuate the fraudulent scrap transactions over the period beginning in mid 1951 and extending to August, 1955. [13] For the present, a summary thereof will suffice:

(a) At the direction of Ossanna and Larrick, adequate records and strict accounting procedures relating to the scrap accumulated and sold were discarded. The Company's auditors disapproved the procedures inaugurated by Ossanna and Larrick but with no avail, and ceased representing the Company because of the loose method of handling and disposing of the scrap. [14]

(b) After American Iron began acquiring overhead scrap from the Company, Ossanna and Larrick issued directions to subordinates to discontinue effective control of the scrap disposed of.

---

12. In Larrick's brief this statement appears: "Larrick does not now raise the question of whether or not there would be sufficient evidence to warrant submission of the scrap transactions as against him, if done so under proper circumstances. It is with respect to the other transactions that the evidence is insufficient to warrant submission as against him."

13. In October and November, 1957, scrap was disposed of for which the Company received $487.34, but for all practical purposes the scrap transactions ceased in September, 1955.

14. Under date of February 27, 1952, the auditors in a letter to Ossanna as president, stated inter alia:
"A second and possibly stronger objection to the proposed method is that it would mean the complete abandonment of accounting control of scrap between the time that it is accumulated and the time

it is sold. The value of scrap in inventory has been relatively large at some times during the course of the years; certainly one would not consider abandonment of accounting control over a similar amount of cash. This accounting control has two practical applications. In the absence of accounting control, the responsible officers have little basis for assuring themselves that proper amounts are received for sales of scrap. Also, the absence of accounting control may well lead to absence of physical control. * * The proposed method exposes the companies to greater danger of loss through stealing."
In a letter under date of November 10, 1952, the auditors advised Ossanna that because of the weaknesses in the accounting records of the Company, they were unable to satisfy themselves as to the correctness of the financial statements and did not wish to continue as auditors.

Thus, in September, 1952, Larrick instructed Walter Larson, purchasing agent of the Company, "From here on out, I don't want you to keep track of any scrap at all. Forget about it. Don't weigh it. Don't keep track of the trucks that come in to haul it away or attempt to price it. Just forget about it. We will take care of that up at the office, 11th Street."

(c) The removal by American Iron of scrap was initiated pursuant to a letter agreement consummated in August, 1951, under which American Iron agreed to "take up all rail, scrap, overhead lines and poles of abandoned streetcar lines without cost to Company, their compensation being the salvage value of the material taken up. They also agree, in taking up the rail, to back-fill to the street level and to repave wherever necessary." At the insistence of the auditors, a contract was entered into under date of February 11, 1952, providing that American Iron should remove tracks, overhead wires, poles, ties and other appurtenances along certain streets in Minneapolis; agreeing further to resurface and restore all portions of roadways and streets as required by city ordinances. As full compensation American Iron was to receive and retain all materials removed by it. It is undisputed, however, that steel rails were removed by American Iron from only one abandoned street and although it repaved this street, there was evidence from which the jury could find that the repaving costs were paid by the Company. The bulk of the rails removed by American Iron was from dirt streets where costly repaving was not required.

On August 13, 1952, an addendum was made to the original contract, including seven lines in St. Paul which were to be removed by American Iron. This addendum further provided that American Iron did not have the obligation to repave any of these streets.

(d) The authority of the Company to use the streets of Minneapolis for operation of its street railway system was derived from a franchise granted by the city. Thereunder the Company was obligated to pave, maintain, repair and improve that portion of the streets between the rails. During the progress of converting, the Company applied to the city for permission to discontinue the operation of streetcars on certain streets. Such discontinuance necessitated the removal of tracks, switches and other apparatus, and the repaving of many streets. After negotiations, and on October 30, 1953, the so-called conversion ordinance was adopted (in reality an agreement between the city and the Company) and which provided in part that the city would perfrom a substantial portion of the work incident to the removal of Company property from the streets, including the paving, repaving and resurfacing of streets over the rails and right-of-way where necessary. In consideration therefor, the Company obligated itself to pay to the city $10,000 per street mile, or a total of $922,790. Additionally, the Company was required to expend an amount not to exceed $300,000 for what is referred to as special work, and which involved in the main the removing of switches, mates, frogs, and other property from the streets. Under the contract of February 11, 1952, with American Iron, the latter was required to do and perform the work which was the subject of the conversion ordinance, and which required the expenditure on the part of the Company of more than $1,200,000. However, startling as it may seem, no effort was made by Ossanna or anyone on behalf of the Company to adjust the contract with American Iron or recover from it any part of the amount paid by the Company to the city. The conversion ordinance is just another circumstance which gives force to the Government's position, sustained by the jury, that the contract under which American Iron was purportedly operating was accorded lip service only and that even before the conversion ordinance, the Isaacses, with the approval of Ossanna and Larrick, were doing an effective job of defrauding the Company of property in substantial portions.

(e) Under date of July 30, 1952, Lynn G. Barnes, then vice-president and general manager of the Company, advised Ossanna that the value of the underground scrap, consisting in the main of copper wire encased in lead cables, was in excess of $1,000,000 and could be removed at a cost of approximately $50,-000.[15] A suggestion from Barnes that the Company remove and sell the cable was ignored by Ossanna who, on January 2, 1953, entered into a second addendum to the February 11, 1952 contract with American Iron. This addendum was interpreted by American Iron as conferring upon it the absolute right to receive and retain all underground cable in consideration for its services in removing the same. It stands undisputed, however, that none of the cable was removed by American Iron. Instead, employees of the Company performed this operation and placed the cable in appropriate lengths on the streets, where it was picked up by American Iron. The scrap was weighed on scales of American Iron and false weight tickets were prepared by its employees at the instance and direction of Fred Isaacs or Landy.[16] Contrary to instructions from Larrick, employees of the Company who participated in the removal of the underground cable made and retained records disclosing the amount of cable actually removed and delivered to American Iron. This information was furnished to Government agents, who were able therefrom to calculate the total amount of cable in pounds that had been removed and to demonstrate the difference between the value of cable actually acquired by American Iron and the amount paid by the latter to the Company, based upon the false and fictitious weights. From exhibits prepared by the Government agents, it appears that whereas the estimated market value of cable received by American Iron was approximately $938,000, the Company received only $123,000.

In an effort to offset the overwhelming evidence of fraud found in the falsification of the weight tickets, appellants took the position in the trial court that American Iron did not purchase the underground cable; that under the contract (second addendum) it was entitled to the cable for its labor and expense incident to removal thereof, and that the amount paid to the Company represented an adjustment of labor costs. We agree with Judge Nordbye's conclusion, expressed in his opinion denying after-trial motions, that this "contention * * * is simply incredible in view of the conduct of the parties."

### MEXICAN NOTES

This transaction, found by the jury to be a part of the scheme and artifice to defraud, culminated in the Company paying $238,349.73 to one George A. Francis.

James A. Quint, engaged in the business of exporting, importing and advertising, was authorized by Larrick to sell streetcars of the Company rendered surplus by the conversion program. Negotiations led to a sale of 91 P.C.C. streetcars to Servicio de Transportes Electricoes, the transit system in Mexico City, Mexico. The sales contract, dated September 4, 1953, provided for a cash payment of $327,541.68 or 20% of the sales price, and payment of the balance of $910,320 in 10 equal semi-annual installments, as evidenced by 10 promissory notes in the amount of $91,032 each, maturing as follows: the first on June 1,

---

15. Barnes resigned from the Company shortly after that date and in September, 1952, became vice-president and general manager of Omaha Transit Company and has been president of that Company since 1955.

16. After American Iron employees had prepared the weight tickets they were changed and falsified by erasing the original weights and inserting lower weights (on an average these lower weights were 20% of the actual weights). In some cases the original tickets were discarded and new false weight tickets prepared. These false weight tickets were then sent to Larrick, who prepared invoices without prices, which were sent to American Iron, who inserted the prices and calculated the amount it would pay the Company.

1954 and one each 6 months thereafter, the last becoming due December 1, 1958. While the contract was dated September 4, 1953, the notes were dated December 1, 1953 and bore interest from that date at 4% per annum. There was a further contractual provision that purchaser had the right to take up the first two notes maturing June 1, 1954, and December 1, 1954, at a discount of 9% upon delivery of the cars to purchaser. The notes were guaranteed by Nacional Financiera S. A., a Mexican agency, stated by a banker witness to be a "Mexican Government entity that covers the financing of the purchases by various Mexican Government agencies—practically everything Mexico buys is guaranteed by the Nacional Financiera." Another banker witness likened the agency to the "equivalent of the Reconstruction Finance Corporation of the United States."

Prior to the consummation of the sale of the streetcars, Ossanna had informed the executive committee of the Company that "the outstanding feature of this deal is that the cars were sold on a contract basis, running for four years, payment being guaranteed by the Bank of Mexico and the Transportes Bank of Mexico." And at the annual meeting of the shareholders of the Company on March 8, 1954, in reporting the sale of the streetcars, Ossanna stated: "We sold them on time and after considerable negotiation, the Bank of Mexico, which is the same as our Federal Reserve Bank in this country, guaranteed payment, and we think we are perfectly safe and we were paid a portion of the amount [of] each car as shipped; the last one was shipped last Friday."

Other evidence discloses that the solvency and soundness of Nacional Financiera had been brought home to Ossanna and Larrick. Thus, in August, 1954, Larrick had obtained information from the Hanover Bank in New York indicating that that institution had extended a line of credit to Nacional Financiera of ten to twelve million dollars; information had been furnished by the foreign department of Northwestern National Bank of Minneapolis attesting to the soundness of the notes; and in accordance with the contract for sale, the Company, on June 11, 1954, received $88,026.06 for each of the first two notes maturing on June 1 and September 1, 1954, representing the face amount thereof, less the 9% discount.

Other parties demonstrated considerable interest in disposing of the notes, although how they acquired knowledge of the Company's position in that regard is not made clear. In the fall of 1953, which was before the issuance of the notes, Harry Bloom, brother of defendant Blumenfield, is found on the scene discussing with one Salk, a Chicago mortgage banker, possible sale of the notes at a discount. Salk desired more information, and in April, 1954, was advised by Larrick that the notes were sound as an investment. Nothing of concrete form was done by Salk toward purchase of the notes, although Bloom endeavored as late as August, 1954, to persuade Salk to purchase these assets.

On October 6, 1954, Robert Levitt, who had been Blumenfield's attorney for many years, advised Ossanna that he was interested in securing an option to buy the notes at a discount of 40% for out-of-town principals whom he represented. (Two of these principals were Blumenfield and Bloom—others were not named). The option was granted by Ossanna on October 11, 1954, and remained in force until November 1, 1954, when Levitt advised Ossanna that the option was being dropped as it involved too much risk. Levitt testified that he surrendered the option because Northwestern National Bank of Minneapolis had informed him that it was not familiar with Nacional Financiera, guarantor of the notes. However, the Government offered evidence establishing that as early as March, 1954, Levitt had been informed by Northwestern Bank that Nacional Financiera met its obligations "with very satisfactory punctuality."

Blumenfield re-entered the picture in February, 1955, when he took Ossanna

to Miami, Florida, to meet with one Sam Kay. The latter offered to buy the notes at a 40% discount. Ossanna assisted in the preparation of the offer which was accompanied by Kay's check for $50,000. This offer was of short duration. On March 14, 1955, Ossanna returned Kay's check and informed him that a prior option held by another party had been exercised. Apparently this reference was to George A. Francis.

It appears that Francis made his entry into the picture in November, 1954, and shortly after Levitt had dropped his option. Having received two offers to purchase the notes at a discount of 40% (both coming directly or indirectly from Blumenfield or his associates), Ossanna informed the board of directors of the Company on November 16, 1954, that there were firms in New York and Chicago that would not take the notes at this discount, and stated: "The danger to us, as in Brazil, is that Mexico can have a change of Government over night and their word wouldn't be worth a nickel." During the same meeting the board adopted a motion offered by Ossanna that "we put through our bank for collection and payment in American dollars the eight notes of Servicio de Transportes Electricoes for purchase by George Francis, of Mexico City, Mexico, at 40% discount, as offered by him * * *." On the same day Ossanna wrote Francis that the board had accepted his offer to purchase the notes at a 40% discount. However, there was no evidence showing when or where Francis made such an offer. The Government did introduce a letter purportedly written by George A. Francis to "Secretary to the Office of President of the Republic" under date of October 7, 1954, in which he stated that "the holders of * * * promissory notes want the Nacional Financiera, S.A. to discount them and in this case, the latter institution will receive the 4% interest designated in favor of the beneficiary. * * *." [17]

On March 16, 1955, the board of directors of Minneapolis Street Railway Company adopted a resolution providing that "this corporation sell to the Hanover Bank, without recourse, all the rights, title, * * * in and to the above described notes and joins with the St. Paul City Railway Company in selling and discounting said notes to the Hanover Bank for a total price equal to 92% of face value, plus 100% of unpaid and accrued interest.[18] On April 8, 1955, the four first maturing notes were sent to Northwestern National Bank with instructions to forward them to Hanover Bank for discounting at 92% of face value. These instructions were carried out. Hanover Bank paid $351,079.25 for these notes and credited this amount to Northwestern National Bank for the benefit of the Company. The Hanover Bank held the notes until their maturity dates, when they were paid in full.

On April 15, 1955, Ossanna sent check to Lewis & McDonald, attorneys of New York, for $5,000, representing their brokerage fee for handling sale of the four notes. On the same day two certified checks were issued payable to George Francis, one in the sum of $15,000, the other for $96,438.24. These checks were authorized by either Ossanna or Larrick, or both, and a notation appeared thereon that they were in payment of commission on sale of the notes.

The remaining four notes were handled differently. On July 26, 1955, they were sent by Ossanna to Northwestern National Bank with instructions to forward them to Banco de Commercio in Mexico City for delivery to Nacional Financiera upon payment by the latter of the sum equal to 87% of the face value, plus 4% accrued interest thereon. Apparently there was a change in instructions to the Northwestern National

---

17. The effect of this offer is not made clear to us from other portions of the letter or record.

18. As previously stated, these corporations are subsidiaries of the parent company. Apparently they owned the streetcars and the notes ran in their favor.

Bank as we find it later directed Banco de Commercio to pay to George Francis out of the proceeds of collection, an amount not to exceed $61,500. This was done, and on August 6, 1955, Northwestern National Bank received a draft in the amount of $323,585.59 representing the face amount of the notes, plus interest, less $61,500 paid to Francis.[19]

On August 10, 1955, a Company check in the amount of $83,316.31 was drawn to the order of George Francis, with requisition attached thereto as follows: "Deliver the following to, mail to George Francis, c/o Jose Leal, 605 S.W. 9th Avenue, Miami, Florida," and bore the approval of Ossanna and Larrick, and stated that it was in full of "any and all commissions and/or discount." On September 23, 1955, another check in the sum of $834.89 was drawn in favor of George A. Francis, covering "balance commission sale of last four notes * *." Thus out of the proceeds of the sale of the eight notes, George Francis received $238,349.73.

Although a subpoena had been issued for George A. Francis, he did not appear and, of course, did not testify. The Government was able, however, to prove that on August 18, 1955, a bank account was opened in the name of George A. Francis in a bank in Miami, the deposit being $83,316.31, and that on August 24, 1955, $53,000 in cash was withdrawn from that account.

In the face of the foregoing facts and circumstances, appellants, and particularly Ossanna and Larrick, advance the argument that the only conclusion that can be drawn by reasonable men is that the course of conduct pursued in the disposition of the notes is invulnerable to a successful charge of fraud; that what was done was legal, proper and legitimate. We are not at all impressed with the urgency of this contention. While a casual and superficial consideration of the various attending circumstances may indicate some basis for the claim of legitimate fair dealing, when the searchlight of truth is focused on the transaction from beginning to end and the numerous ramifications thereof, we have no difficulty in finding a factual basis for the conclusion, obviously reached by the jury and shared in by the trial court, that a substantial amount of the Company's property was diverted from it and obtained by others not entitled thereto by fraudulent means. From our summary, it is made to appear that even before the notes were executed certain defendants and their close associates were maneuvering to dispose of them for a greatly reduced price. Later Ossanna granted two options, one to the attorney for Blumenfield, the other to Blumenfield's associate, for disposition of these assets at 60% of their face value. This was done notwithstanding Ossanna had vouched for the soundness of the notes on at least two prior occasions. While neither of the options was exercised, it is quite apparent that Ossanna utilized both offers very effectively by prevailing on the board of directors to authorize a sale of the notes to George A. Francis at a discount of 40%. The final chapter of this bizarre story is that although the board of directors authorized the sale of the notes to Francis, he did not in fact buy any of them. Neither is the evidence at all sufficient to satisfy reasonable men that Francis rendered any services beneficial to the Company in the disposition of the notes.

### HOPKINS-RIGHT-OF-WAY

In 1951 the Company abandoned the streetcar line that ran from the city limits of Minneapolis (France Avenue) to Central Avenue in the City of Hop-

---

19. The covering letter from Banco de Commercio to Northwestern National Bank referred to a receipt from Francis, which actually was in the form of a letter purportedly written by Francis to Banco de Commercio, stating, inter alia: "In accordance with the instructions of the mentioned Bank (Northwestern National) they have gave to me from your collection the amount of $61,500 U.S.C. * *." The letter states further that "Amount for liquidation of the interests of the Financiera S.A." was $18,739.71, thus indicating that Francis' net was $42,760.29.

kins, Minnesota, leaving for disposal the right-of-way, the overall length of which was 3.6 miles. For a distance of 1.25 miles this strip of land was 66 feet wide and the remainder was 100 feet wide. Record title was held by Minneapolis and St. Paul Suburban Railroad Company, one of the subsidiaries of the parent company. It was the Government's position, and the indictment alleged, that "It was a part of said scheme and artifice that properties of the Transit Companies, including part of that known as the Hopkins Right-of-Way * * * would be transferred by the Transit Companies for a grossly inadequate consideration and to and through one Walter N. Carlson and for his benefit and the benefit of the defendant's associates and of their nominees, including Fred Ossanna, Jr. and Mrs. M. A. Stirton, a daughter of defendant Fred A. Ossanna, and of Shady Oaks Realty Co., and of others to the grand jury unknown."

The following facts with respect to this property were developed by the evidence. At the request of appellant Ossanna, one Brancheau, an experienced real estate dealer and appraiser in Minneapolis, submitted an appraisal on September 1, 1951, which divided the right-of-way into four sections, aggregating $84,500.[20] Additionally several members of the Minneapolis Real Estate Board made an appraisal of the portion of the right-of-way from Brookside Station to Central Avenue, and fixed the value at $40,550. (This same section had been appraised by Brancheau at $37,000). It was also made to appear that shortly after this property became surplus the Company determined the value of the entire strip for selling purposes to be approximately $98,000.[21]

The municipalities and political subdivisions (hereinafter referred to as municipalities), some six in number, through which the right-of-way ran, formed a committee for the purpose of purchasing the same for use as a thoroughfare into Minneapolis. This committee functioned through or in conjunction with the Board of Hennepin County Commissioners (Board). Under date of May 15, 1952, the Board by letter directed to the attention of Ossanna, offered to pay $56,500 for the entire right-of-way. A meeting between representatives of the interested municipalities and representatives of the Company, the latter including Ossanna, was held on May 19, 1952, during which "Mr. Ossanna informed the committee that he could not recommend to the board of directors of this Company the sale of the right-of-way at such a low figure" [$56,500]. Thereafter, on July 1, 1952, the Board made a written offer to purchase that part of the right-of-way from Brookside Station to a point in Hopkins for $75,000.[22] By letter of July 7, 1952, Ossanna accepted this offer, in which he also stated: "Our previously stated offer to sell this right-of-way, as contained in our letter dated April 22, 1952, at a price of $98,500 was, in our considered opinion, a very low price * * *." Thereafter, on October 15, 1952, a contract was entered into between the record title holder of a portion of the property involved and the City of Hopkins, which granted the city an option to purchase the same for $75,000.[23] This option was renewed from time to time until the summer of 1953. On July 9, 1953, in a letter directed to

20. A small section extending about a block at the city limits of Minneapolis, having commercial value, was appraised at $9,000; the portion of the strip which extended 1.25 miles, being 66 feet wide, was appraised at $15,500; the portion that extended from Woodale Avenue to Brookside Station, being 100 feet wide, was appraised at $23,000, and the remainder at $37,000.

21. Daniel J. Bren, who was assistant to the president in 1951, testified: "We es-

tablished a price on the right-of-way from France Avenue to Hopkins of approximately $98,000."

22. From plats of the right-of-way it would appear that this portion constituted more than half of the entire strip.

23. Although all prior dealings for purchase of the property had been on behalf of the six municipalities, it will be noted that the option was only with the City of Hopkins.

"Chairman Right-of-Way Purchase Committee" Ossanna offered to sell the remainder of the right-of-way (France Avenue to Brookside Station) for "cash consideration of $75,000." This latter offer was not accepted, the Hopkins option was never exercised, and negotiations with the municipalities ceased in September, 1953.[24]

Apparently no further action was taken with regard to disposition of this property until September 13, 1954, when the board of directors of the Company authorized Ossanna and Towey to effect the sale of the right-of-way "on the best possible basis before taxes became due." The next event of consequence occurred on May 6, 1955, when at a special meeting of the board of directors Ossanna reported that the "Hopkins right-of-way had been agreed to be sold to W. N. Carlson for the sum of $10,000, we to pay the back taxes and give proper deed." On the same date a deed conveying the property was executed by Towey and Ossanna.

The record discloses that shortly after Carlson acquired the property, appellant Jeffords entered upon the scene. He acquired an option to purchase a small portion of the right-of-way from Carlson for $6,000 and paid $3,000 with the execution of the option contract. On November 25, 1955, the option contract was modified whereby Jeffords released a portion of the property under option in consideration of the payment to him of $8,-000. . (This was accomplished by the forgiveness of $3,000 under the original option and a payment of $5,000 over and above that). The net result of the modification was that Jeffords acquired a lot and $2,000 in cash from Carlson. Jeffords later sold the property for $12,000, thus realizing a profit on the whole transaction of $14,000.

Shortly after Carlson acquired the property he entered into an agreement with Fred Ossanna, Jr. and Margaret Stirton, son and daughter of appellant Ossanna, under which they were to share "fifty-fifty" in the profits derived from the sale of the real estate. Thereafter and through the efforts of a real estate company, and during the years 1955, 1956 and 1957, Carlson sold the remainder of the Hopkins right-of-way for a total of $126,075.56.[25] Carlson paid to Fred A. Ossanna, Jr. and Margaret Stirton, the following amounts:

| Date | Name | Amount |
|---|---|---|
| April 25, 1956 | Fred A. Ossanna, Jr. | $15,000.00 |
| April 25, 1956 | M. A. Stirton | 15,000.00 |
| December 19, 1956 | M. A. Stirton | 5,000.00 |
| December 19, 1956 | Fred A. Ossanna, Jr. | 5,000.00 |
| July 16, 1957 | M. A. Stirton | 6,000.00 |
| July 16, 1957 | Fred A. Ossanna, Jr. | 6,000.00 |
| | Total | $52,000.00 |

The $15,000 check to Fred A. Ossanna, Jr. was endorsed payable to an Ossanna owned Company, and the $15,000 check to Margaret Stirton was endorsed payable to appellant Ossanna.[26]

It should also be stated that appellant Ossanna was active in negotiations carried on for sale of the property after it was acquired by Carlson. The latter informed the realtor who was handling the

24. Thus we see that Ossanna had placed a value of $150,000 on the entire right-of-way.

25. Apparently the net amount realized by Carlson, after deducting expenses incident to sales, was $90,533.92.

26. Evidence was offered by appellants to show that the sum of $52,000 was paid to reduce indebtedness of Fred A. Ossanna, Jr. to Shady Oaks Realty Company, a corporation owned by the Ossanna family, and indebtedness of Margaret A. Stirton to appellant Ossanna.

sales that Ossanna was Carlson's counsel, and the realtor was directed to consult with Ossanna when Carlson was not available. Copies of correspondence from the realtor to Carlson were sent to Ossanna.

From the foregoing chain of circumstances established by undisputed evidence, we have no difficulty in concluding that there was substantial evidence to support a finding that the transaction was motivated by fraud and not as a result of an honest desire to protect the interests of the Company. As was true with regard to disposition of the Mexican notes, there were negotiations which facially indicated legitimacy but when the ultimate result is considered, the shell of fair dealing is pierced, and the true intent and purpose of the main participants is revealed. There simply is no logical explanation for disposition of property appraised at $84,500, valued by Ossanna at $98,500 and $150,000, being sold for $10,000, so that the purchaser was enabled to reap a profit of nearly one thousand per cent, and one of the appellants, who unquestionably dominated and controlled the entire situation insofar as the Company was concerned, being the recipient directly or indirectly of $52,-000.

### JEFFORDS' COMMISSIONS

This facet of the scheme involves the sum of $107,500 paid to appellant Earl A. Jeffords, who was a licensed real estate broker, doing business as J & C Holding Company. As we shall presently see, four checks totaling that sum were issued in payment of commissions purportedly due Jeffords in connection with the sale of three different parcels of real estate which had become surplus property. The controverted issue resolved in favor of the Government is whether Jeffords was legally entitled to the commissions as urged by him, or whether, as contended by the Government, the payments were wholly without consideration and constituted a part of the scheme and artifice to defraud the Company.

On July 6, 1954, a requisition signed by Larrick and Ossanna, initialed by Towey, directed the issuance of the Company's check to Jeffords in the sum of $12,500 "covering commission on power plant in excess of $1,250,000." Jeffords asserted that he was the procuring cause for sale of the power plant to Northern States Power Co. and consequently was entitled to the commission. The Government's position was exactly to the contrary. Our review and analysis of the record convinces that there was substantial evidence to support the Government's position. Indeed, the official minutes of the Company plainly established that Ossanna was given credit for disposing of the property through his sole efforts.[27]

The Company's Currie Avenue property was sold to the City of Minneapolis in November, 1954, for $200,000. On the day before the sale was authorized by formal action of the board of directors, Jeffords made a demand for $20,000 commission in accordance with an exclusive sales contract. However, the contract so relied on was not produced by Jeffords then or at any time during the trial. He did not claim to be the procuring cause for sale of the property. In the evidence, which is substantial in nature, we find facts and circumstances clearly supporting the conclusion that Jeffords' claim of an exclusive contract was entirely fictional and not based on fact.

The Company owned an improved tract of approximately 27 acres at University and Snelling Avenues, St. Paul, Minnesota, that was sold in January, 1955, for $1,500,000, less depreciation and adjustments, the amount actually received by the Company being $1,334,504. One Paul Villaume, a distant relative of Ossanna, was a real estate dealer and procured the purchaser for this property. He was

---

27. In an interview with two agents of the Internal Revenue Service, Ossanna stated that he had personally sold the power plant to the Northern States Power Co. for $1,250,000.

paid a commission of $37,500, being 2½% of the gross sales price.[28]

At meetings of the board of directors of the company (September 14 and 17, and December 30, 1954), the only commission discussed in connection with the sale was that due Villaume. Indeed, at the September 17 meeting, Ossanna assured the board there would be no additional commissions paid in connection with the sale. As late as January 14, 1955, in seeking release of the lien of the mortgage on the property, Ossanna and Towey certified to the Northwestern National Bank that the broker's commission was $37,500. On that day Villaume submitted his bill, and on January 17, 1955, pursuant to requisition signed by Ossanna, check was sent to Villaume for $37,500. Notwithstanding the prior assurances with respect to the amount of commission that would be paid, we find that on authorization of Ossanna, Larrick and Towey, Jeffords was paid $75,000 under the guise of a commission. This payment was in two checks, the first dated January 25, 1955, in the amount of $35,000, and the second under date of February 16, 1955, in the amount of $40,000. To afford justification for the payment of the $75,000, reliance was based on a contract which on its face gave Jeffords' company (J & C Holding Company) the exclusive right to sell the property "for one year from this date—April 15, 1954, to April 15, 1955" and under which the Company was obligated to pay to him a commission of 5% of the total sale price. This document was signed by Ossanna and Towey as president and secretary of the Company. To further justify the payment, and as authority for the purported contract, appellants rely upon action of the executive committee of the Company, as disclosed by minutes of the meeting of that committee supposedly held on April 12, 1954.[29] The evidence conclusively and convincingly established that the minutes were not prepared on the date of the indicated meeting but were in fact prepared and inserted in the minute book in the early part of 1955. The inference is quite clear that they were prepared at about the time the sale was made and the payment sent to Jeffords. Appellants contend that even though the minutes were prepared at a later date, the meeting was nonetheless held on April 12, 1954, and the minutes truly reflect the action taken. At best, this was a question of fact to be resolved by the jury, which had before it evidence of unusual circumstances, which, in our judgment, may properly be characterized as badges of fraud. The entire transaction gives basis for the conclusion that the preparation of the minutes, as well as the purported contract —were in fact fraudulent transactions —designed to give the appearance of legality.

While there was no direct evidence of kick-backs from Jeffords, his disposition of the $107,500 was revealed and proved interesting, if not significant. The commission of $12,500 (power plant) was deposited on July 17, 1954, and at the same time Jeffords withdrew $11,500 in cash.

---

**28.** Shortly after receiving the commission, Villaume gave $7,500 thereof to the Ossanna Foundation. The Government's theory was that as a part of the scheme and artifice to defraud, the Company paid in the form of a commission $7,500 more than it was obligated to pay to Villaume. This payment was the subject of Counts XII and XIII of the indictment. As we have seen, the court dismissed Count XIII and the jury acquitted on Count XII.

**29.** These minutes recited in part: "There was presented to the Committee request for exclusive option on the sale of the company property at Snelling and University Avenues. This was made by the J & C Holding Company, real estate dealers at 1321 Nicollet Avenue. * * * On motion by Mr. Larrick, seconded by Mr. Aune, it was moved that the Executive Committee * * * instruct its officers to grant exclusive right of sale contract to the J & C Holding Company * * * for a period of ten months from April 15, 1954, on a commission basis of 5% * * *. In case of the sale of the property by J & C Holding Company, or any other sales agency, commission of 5% is to be paid * * * in two equal installments, not less than 30 days apart."

The $20,000 received in connection with the Currie Avenue property was deposited on November 18, 1954, and on the same date Jeffords withdrew $15,000 in cash. When the $35,000 was deposited, Jeffords withdrew $25,000 in cash and when he deposited the $40,000 he withdrew $30,000 in cash. He claimed in a statement to an agent of the Internal Revenue Service that after the latter two withdrawals he departed for Florida with the greater portion of $55,000 in the back of his automobile, with the intention of purchasing real estate but that he lost the entire amount betting on horses at races he attended in Florida.

### TOWEY LOTS

As previously stated, James A. Towey was not tried because of illness. He was an active participant in this transaction which concededly resulted in a loss to the Company.

Since none of the appellants questions the sufficiency of the evidence to establish fraud in the disposition of this property, our review of the facts is limited to those which stand out in bold relief.[30]

In the early part of 1954 and in the presence of two employees of the Company and Towey, Larrick offered to sell certain lots along the Harriet Right-of-Way for $500. Towey accepted the offer, paid $500 to the Company and at his direction a deed dated March 1, 1954, was executed whereby the record title was conveyed to Bernard Heintz, an uncle of Towey. Heintz testified he knew nothing about the transaction. Approximately six months later Towey sold the lots for $5,500 and caused his uncle to execute a deed to the purchasers. The sale became the subject of a hearing before the Railroad and Warehouse Commission of the State of Minnesota in 1958. There is evidence that shortly thereafter Towey paid additional money to the Company. The suggestion in the briefs of appellants that the payment was in connection with the lots does not find support in the record. In any event, the evidence supports a finding that this transaction was the result of rank fraud, participated in not only by Larrick, who set the stage, but also by Ossanna, who, at a meeting of the board of directors of the Company, made the motion whereby the board was persuaded to approve the sale to Towey.

The foregoing summary of the evidence and our conclusions should suffice to dispose of the first issue—the sufficiency of the evidence to support the finding of fraudulent conduct in the disposition of the company's property which was the subject of the transactions we have reviewed.

This brings us to the key issue—was the fraudulent conduct the result of a single, overall scheme to defraud? Here, it is strenuously insisted that there is no evidence affording proof that appellants, particularly Larrick, Harry Isaacs, Fred Isaacs and Jeffords, knowingly joined, adhered to, and participated in a single scheme to defraud. Hence it is claimed that in light of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L. Ed. 1557, substantial prejudice resulted from a trial en masse of all appellants with acts of one being admitted against others.

The instant question is not new to the courts. Out of numerous cases general principles have evolved which have application here.

A fraudulent scheme and conspiracy may be and usually is established by circumstantial evidence; by inferences from the evidence of relationship of the parties and by overt acts, conduct and other probative circumstances. Marbs v. United States, 8 Cir., 250 F.2d 514, 522, 523, cert. den. sub nom. Sarkis v. United States, 356 U.S. 919, 78 S.Ct. 703, 2 L.Ed.2d 715; Marx v. United States, 8 Cir., 86 F.2d 245, 250; Phelps v. United States, 8 Cir., 160 F.2d 858, 867, cert. den. sub nom. Peters v. United

---

30. In his brief Larrick states: "No one would contend that the defendant Towey, masquerading as Bernard Heintz, in re- selling this property to the Heutmakers, did not profit thereby and did not defraud the Transit Company."

States, 334 U.S. 860, 68 S.Ct. 1525, 92 L. Ed. 1780; Madsen v. United States, 10 Cir., 165 F.2d 507, 511. "Conspirators ordinarily do not announce that they have joined their efforts for the purpose of engaging in or furthering some unlawful scheme or plan—rather they are inclined to cover their machinations, thereby casting upon the prosecution the burden, sometimes difficult, of establishing the conspiracy, and the overt acts in consequence thereof, by circumstantial evidence,—by actions of the conspirators." Blumenfield v. United States, 8 Cir., 284 F.2d 46, 53, 54, cert. den. 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692.

■ "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances'." Glasser v. United States, 315 U.S. 60, at p. 80, 62 S.Ct. 457, 469, 86 L.Ed. 680; where the evidence affords satisfactory proof that a conspiracy has been formed, "but slight evidence connecting a defendant therewith may still be substantial, and if so, sufficient." Galatas v. United States, 8 Cir., 80 F.2d 15, 24, cert. den. 297 U.S. 711, 56 S.Ct. 574, 80 L.Ed. 998; McDonald v. United States, 8 Cir., 89 F.2d 128, 138, 139, cert. den. 301 U.S. 697, 57 S.Ct. 925, 81 L.Ed. 1352; Marx v. United States, supra, 86 F.2d 245, at p. 250. As pertinently stated by this Court in Phelps v. United States, supra, 160 F.2d 858, at p. 867: "Once there is satisfactory proof that a conspiracy has been formed, the question of a particular defendant's connection with it may be merely a matter of whether the stick fits so natural into position in the fagot as to convince that it is part of it." Cf. United States v. Cohen, 3 Cir., 197 F.2d 26, 29; Nye & Nissen v. United States, 9 Cir., 168 F.2d 846, 852, aff'd 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; Meyers v. United States, 6 Cir., 94 F.2d 433, cert. den. 304 U.S. 583, 58 S.Ct. 1059, 82 L.Ed. 1545.

■ It is not necessary to support a finding of the existence of an overall scheme or conspiracy that each participant knew others involved therein or the precise part each was playing. Lefco v. United States, 3 Cir., 74 F.2d 66, 68, 69.

" * * * (I)t is most often true, especially in broad schemes calling for the aid of many persons, that after discovery of enough to show clearly the essence of the scheme and the identity of a number participating, the identity and the fact of participation of others remain undiscovered and undiscoverable. Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of corrolating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity." Blumenthal v. United States, 332 U.S. 539, at pp. 556, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154.

■■ The substantive offenses proscribed by Title 18 U.S.C.A. §§ 1341 and 1343 (mail fraud and fraud by wire) are closely related to a conspiracy, proscribed by Title 18 U.S.C.A. § 371. The distinguishing feature is that the former may be conceived by one person, and the mails or wire must be used for purpose of executing the scheme, while a conspiracy requires an agreement of two or more to violate the law, and at least one overt act in furtherance of the conspiracy. In Blue v. United States, 6 Cir., 138 F.2d 351, 358, cert. den. 322 U.S. 736, 64 S.Ct. 1046, 88 L.Ed. 1570, the Court stated: "(w)hen a scheme to defraud is shared in by two or more, it becomes a conspiracy; the rules of evidence are the same as where a conspiracy is charged (Robinson v. United States, 9 Cir., 33 F.2d 238);

and the act of each party in furthering the common scheme is the act of all."

■ Each participant in a scheme to defraud is responsible for the use of the mails and wire used to execute and carry out the scheme.

" 'Where two or more persons jointly devise and execute a scheme to defraud by the use of the mails, they may thereby become in effect partners in the criminal purpose of so using the mails to defraud. If they do, the acts of each thereafter, during the existence and execution of the scheme, done in furtherance of that execution, may become the acts of all the partners, and each may be convicted of the mailing of a letter which one of his partners caused to be mailed in the execution of the scheme.' " Baker v. United States, 8 Cir., 115 F.2d 533, 540, cert. den. 312 U.S. 692, 61 S.Ct. 711, 85 L.Ed. 1128.

See also Steiner v. United States, 5 Cir., 134 F.2d 931, 934, cert. den. 319 U.S. 774, 63 S.Ct. 1439, 87 L.Ed. 1721.

By applying the foregoing principles we conclude that there was substantial evidence from which the jury could find: (1) the existence of an overall scheme to defraud; (2) that the transactions under scrutiny were a part of that scheme; (3) that the appellants with knowledge of its existence, adhered to and participated in the scheme devised by one or more of them; (4) that as participants in the scheme, and for the purpose of furthering and executing the same, Ossanna, Larrick and Harry Isaacs used the mails or wire, or both; (5) that by express or implied agreement, a conspiracy was formed to commit the substantive offenses of mail fraud and fraud by wire, and the appellants were parties to or joined such conspiracy.[31]

■ In reaching this conclusion we have applied the principle universally rec-

31. Judge Nordbye submitted the issue of a single, overall scheme and a conspiracy to the jury as follows:

"The first question, therefore, which you jurors will have to determine is whether the Government has established beyond a reasonable doubt the overall scheme or plan to defraud, and loot, so to speak, the Transit Company of property, real and personal, which would be available by reason of abandonment or non-use on account of the conversion of the Transit Company transportation facilities from streetcars to buses. * * *

"The Government does not contend that these defendants got together at one time and planned a scheme to defraud the Transit Company. It is sufficient if the scheme to defraud as alleged was conceived in the minds of one or more of the defendants. If it was, and the other defendants, with knowledge of the scope of the scheme, knowingly and intentionally entered into and participated therein, then as to such defendant or defendants, they would be parties to the scheme and responsible in law for the acts of their fellow confederates in furtherance of the scheme, if committed during the existence of the scheme. * * *

 * * * * *

"In summary, therefore, as to the mail fraud and wire fraud counts, in order to

find any one of these defendants guilty, you must find that there was an overall scheme initiated by one or more of these defendants to defraud the Transit Company of its assets, real or personal, which were abandoned or made available for sale by reason of the conversion from streetcar transportation to bus transportation. If there has not been established such an overall scheme to defraud beyond a reasonable doubt, then no defendant can be found guilty of any of these counts.

 * * * * *

"A conspiracy, members of the jury, is an agreement of two or more persons by concerted action to perform an unlawful act. One person alone cannot conspire. Two or more persons are indispensable. The essence of a conspiracy is a common design which actuates the parties. * * *

"The question you should ask yourselves, in light of the evidence, is: Was there an agreement or understanding to loot or plunder the Transit Company, either express or implied, between two or more of the defendants named and embraced in that overall scheme that they would commit one or more of the unlawful acts charged in the conspiracy count of the indictment?"

ognized, that if the evidence viewed in light most favorable to the Government is such that reasonable minds "might differ" then the question becomes one of fact for the jury to resolve, and not one of law to be determined by the courts. See and compare Brennan v. United States, 8 Cir., 240 F.2d 253, 259, cert. den. 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed. 2d 723; Connelly v. United States, 8 Cir., 249 F.2d 576, 585, cert. den. 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716; Northcraft v. United States, 8 Cir., 271 F.2d 184, 187.

The existence of an overall scheme finds support in the scope and magnitude of the fraudulent conduct. It extended to a substantial portion of the Company's property made available for disposition as the result of the conversion program. That property of varying characteristics was the subject of more than one transaction and different parties participated therein, does not necessarily negate the existence of one common and broad objective, or conclusively establish that each transaction was the product of an independent agreement or scheme to defraud.

The scheme made its appearance in the methods adopted and pursued in the handling and disposition of the first item of surplus property—overhead scrap and rails. From this beginning in 1951 fraudulent conduct dominated the disposition of scrap until the last lot was disposed of in late 1955. The fraud intensified as scrap disposition progressed until, as aptly stated by the trial court: " * * * Ossanna and Larrick having laid the ground work so as to allocate to themselves complete control of the disposition of the underground cable, boldly permitted American, through Harry and Fred Isaacs, to write its own ticket, figuratively and literally, as to the price American was to pay for this scrap, with the resulting substantial monetary loss to the Transit Company." In the interim, the fraud made its appearance in other transactions to which we have alluded. Thus through the combined efforts of appellants, the Company was mulcted out of property of staggering proportions.[32]

The jury was entitled to consider the relationship of appellants to each other and to co-conspirators not named as defendants as an additional factor bearing heavily on the hypothesis of one scheme and conspiracy. The evidence indicated that Ossanna was the dominating character. He apparently masterminded the scheme and its fruition and played the leading role. Closely allied to Ossanna and collaborating with him in the machinations were appellant Larrick and defendant Towey. While their activities were not as prominent, it is apparent that without their assistance it would have been difficult to perpetrate and effectuate the fraudulent scheme. Appellant Harry Isaacs was not a direct actor in all the various transactions but he too performed an important role in the overall scheme. If not an originator of the scheme, he soon became a party thereto. His part in the fraud is made manifest from the scrap disposition (the scheme had its genesis in the handling of the scrap and it had its demise in the scrap). Harry Isaacs was the recipient of other Company property. In December, 1953, the Mid-Continent Development and Construction Company (a partnership consisting of Harry Isaacs, owner of 47½%, Robert Levitt, Isadore Blumenfield and four other business associates) purchased seven parcels of real estate from the Company and various items of scrap for $300,000. The partnership sold the

32. Loss from underground cable $815,000, Mexican notes $238,439, Hopkins Right-of-Way $75,000 (this is based on appraised value of property—Carlson and the Ossannas actually netted over $90,000 from the transaction), Jeffords' commissions $107,500, Towey Lots $5,000. Additionally, there was the loss from overhead scrap and rails, the amount of which does not appear with certainty. We have seen, however, that the Company was required to pay to the City of Minneapolis approximately $1,200,000. There was evidence from which the jury could find that a large portion of this expense should have been borne by American.

property in 1954 and 1955 for a sum in excess of $465,000. The sale to Mid-Continent was consummated after Ossanna had received other offers and had executed option contracts on certain of the parcels. The court ruled that the amount paid by the partnership for the property ($300,000) was not so grossly inadequate as to furnish evidence of fraud, and dismissed these counts of the indictment. However, the court instructed the jury it could consider the evidence relating to this transaction to show relationship of the parties.[33]

There was other evidence showing the close relationship between Harry Isaacs and Larrick, two of the principal actors in the scrap transaction. In 1955 and near the termination of the scheme, Larrick loaned Isaacs $10,000. The trial court viewed this transaction with some suspicion, stating in his after-trial memorandum: "Many inferences may be suggested from that episode. In any event, it is significant that Larrick, an officer of the Transit Company, loaned a substantial sum of money to one who at the time was looting his employer of thousands of dollars."

The role of appellants Fred Isaacs and Jeffords, charged with and convicted of participation in the overall scheme, under the conspiracy count, while less prominent, was nevertheless important and essential in carrying out the scheme. Fred Isaacs was secretary of American Iron and as such was a party to the original scrap removal. He was active in the whole scrap program. The fraud he practiced was of the rankest kind, as manifested in the changing of weight tickets to the benefit of American Iron and to the loss of the Company. The fraudulent disposition of the scrap became and was one of the major objectives of the scheme, it was part and parcel thereof, and being so, sound authority and common logic dictate that Fred Isaacs became a knowing participant in the scheme and aided in its perpetration.

Jeffords was a close associate of Ossanna and manifested more than a passing interest in the affairs of the Company. As a shareholder he became a member of Ossanna's stockholders' committee, which was successful in its endeavor to place Ossanna in control. As we have noted, he profited to the extent of $14,000 in the transactions involving the Hopkins Right-of-Way. His manipulations assisted in effecting the overall scheme whereby the Company paid to him a large sum of money without any consideration or benefit inuring to it.

The maze of circumstances furnishes adequate factual support for a finding that a common broad scheme and plan was conceived at or about the time the conversion program was initiated. As the scheme took form through concrete action, others joined as their efforts were required, so that a closely knit and relatively small group of men was drawn together, their efforts were united, and by devious, ingenious and unlawful means the common objective—looting the Company of substantial property—was effectuated. There were "insiders," Ossanna, Larrick and Towey; there were "outsiders" among them, Harry Isaacs, Fred Isaacs and Jeffords. From the ultimate result it becomes apparent that each fitted "so naturally into position in the fagot as to convince that [he was] part of it." Phelps v. United States, supra, 160 F.2d at p. 867.

Our holding does not run counter to the cases relied upon by appellants. They have been considered and in our view are distinguishable on the facts. No useful purpose will be served by an extended discussion of the factual elements present in the cases relied upon which required reversals of the judgments of conviction. We limit our examination to two opinions by the Supreme Court of the United States because of the urgent claim that they control.

33. The court instructed the jury that there was no evidence that Ossanna or Isaacs knew of the Blumenfield group's interest in Mid-Continent.

In Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503, the four petitioners and six others were convicted of a conspiracy to evade and defeat payment of federal taxes imposed on lottery operations. The Court held that the evidence was insufficient to support a finding that two employees of Ingram and Jenkins knew that the latter had not paid the taxes. In the course of the opinion the Court stated, at pp. 677–678, 79 S.Ct. at p. 1319:

"It is fundamental that a conviction for conspiracy under 18 U.S.C. § 371 cannot be sustained unless there is 'proof of an agreement to commit an offense against the United States.' Pereira v. United States, 347 U.S. 1, 12 [74 S.Ct. 358, 364, 98 L.Ed. 435]. There need not, of course, be proof that the conspirators were aware of the criminality of their objective, but an essential ingredient of the proof was knowledge on the part of Smith and Law that Ingram and Jenkins were liable for federal taxes by reason of the gambling operation. 'Without the knowledge, the intent cannot exist.' Direct Sales Co. v. United States, 319 U.S. 703, 711 [63 S.Ct. 1265, 1269, 87 L.Ed. 1674].

" '[C]onspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself.' The substantive offense which Smith and Law were accused of conspiring to commit was the willful evasion of federal taxes, an offense which, even presuming knowledge of the tax law, obviously cannot be committed in the absence of knowledge of willfulness. Spies v. United States, supra [317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418]. Cf. United States v. Falcone, 311 U.S. 205, [61 S.Ct. 204, 85 L.Ed. 128]."

From the foregoing, the appellants have erroneously concluded that the accused must possess full knowledge of every detail of an unlawful scheme before he may be properly held to be a part of it. We do not regard the case as so holding. As pointed out in Blumenthal v. United States, 332 U.S. 539, at p. 557, 68 S.Ct. 248, at p. 256, conspirators may be found guilty "without requiring evidence of knowledge of all * * * details [of the conspiracy] or of the participation of others."

In Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, the only question was whether petitioners had suffered substantial prejudice from being convicted of a single general conspiracy by evidence which the Government conceded and the court of appeals had found (United States v. Lekacos, 2 Cir., 151 F.2d 170) proved not one conspiracy but eight or more different ones of the same sort executed through a common key figure. The Supreme Court, in distinguishing Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, held that a defendant has "the right not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others * * *." Having demonstrated the existence of substantial evidence to support the finding of a single overall scheme to defraud, the teachings of Kotteakos are clearly inapplicable. It is, of course, well settled that all parties joining a conspiracy, whether at the time it is formed or later, and who cooperate in the common effort to obtain unlawful results, assume responsibility for all that is done before or after becoming a party thereto. Marbs v. United States, supra, 250 F.2d 514, 522, cert. den. sub nom. Sarkis v. United States, 356 U.S. 919, 78 S.Ct. 703, 2 L.Ed.2d 715; United States v. Compagna, 2 Cir., 146 F.2d 524, 530, cert. den. 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1432; Lefco v. United States, 3 Cir., 74 F.2d 66, 68.

We now direct our attention to the contention that in any event appellants are entitled to another trial. The claim is made that their rights were substantially prejudiced by the court's action in giving and refusing certain instructions, by its rulings on evidentiary matters and

by the rebuttal argument of Government counsel.

■ Both indictments alleged that as a part of the scheme to defraud, Harry Isaacs and American Iron, having become obligated to the Company to fulfill substantial portions of its obligations to the City of Minneapolis, would be relieved of that obligation without consideration and at the expense of the Company. This portion of the indictments as well as considerable evidence bearing on the scrap transactions brought into focus the conversion ordinance adopted by the city in October, 1953, and to which prior reference has been made. More precisely, it became an issue as to whether the ordinance was in fact a device or instrument to further the scheme and plan to defraud the Company. On this issue the defendants requested the court to give the following instruction:

"There is no evidence that the passage of the Minneapolis Conversion Ordinance in October, 1953 was procured with the design of relieving American of its obligations to repave any of the streets in Minneapolis, or as a part of any scheme to defraud the Transit Company."

The court refused to give the requested instruction and proper exceptions were taken to such refusal, so that the court's action in that regard is preserved. The issue was submitted to the jury by the following portion of the court's charge:

"It is the Government's contention that, to all intent and purposes, the contract of February 11, 1952, and the addenda thereto, were abandoned, and in pursuance of the scheme to defraud, American was relieved of its obligation to do any paving by the arrangement allegedly made by the defendant Ossanna in fostering the City Ordinance of October 30, 1953, which, according to the Government, in effect relieved American of its obligation to remove the tracks and to repave where necessary; that in order to be relieved of the obligations of rail removal and repaving which American had assumed under the February 11, 1952, contract and its addenda, together with being relieved of snow removal and sanding of streets, and so forth, and other provisions of the franchise, the ordinance provided that Transit was required to pay to the City of Minneapolis some $900,000, * * *.

* * * * * *

"What about the ordinance passed by the City of Minneapolis to relieve the streetcar company of its duty to remove tracks and repave and the other obligations which the streetcar company had under its franchise? Was that a device arranged by Ossanna and Isaacs to free American from the alleged onerous burden of going forward with the contract, * * *? * * * (I)f you find that the agreement in that regard between the Transit Company and Minneapolis City Council was negotiated and made without fraud and not as a part of an alleged overall scheme to defraud, and if American Iron was in good faith ready, willing and able to perform the obligations expressed in its contract of February 11, 1952, and the two addenda, then the fact that, after that contract and addenda were executed, the conversion ordinance was enacted, the Transit Company was not discharged of its obligation to American under the contract of February 11, 1952, and the addenda, nor was American deprived of any of its rights under the contract and the addenda."

Although none of the defendants objected to the instruction, as required by Rule 30, Federal Rules of Criminal Procedure, four of the appellants, Ossanna, Larrick and the Isaacses, now assert error in the foregoing submission. While technically we would be justified in refusing to review the correctness of the given instruction, we have decided against that course. By offering the instruction and taking exception to its refusal, timely and spe-

cifically, the position of appellants was made known to the court. See and compare United States v. General Motors Corp., 3 Cir., 226 F.2d 745, 750; Hasselbrink v. Speelman, 6 Cir., 246 F.2d 34, 39; Moore, Federal Practice, Vol. 5, § 51.04, p. 250. Moreover, consideration and determination of the question properly preserved (refusal of instruction) will entail exploration of whether the issue should have been submitted, and the correctness of the submission.

Specifically, the complaining appellants now contend that there was no evidence of fraud in the procurement of the conversion ordinance; that all negotiations and bargaining between the city officials on the one hand and the Company representatives on the other which were consummated in the adoption of the ordinance were at arm's length and in good faith; that there was evidence from which the jury could find that the contract of February 11, 1952, and the addenda thereto was a valid and binding agreement and that the terms thereof were being performed and complied with in every respect. Upon this factual premise appellants invoke the rule that where erroneous instructions are given on a basic issue, a conviction cannot be sustained on some other theory, even though "the appellate court is left without doubt" that the defendant is "guilty." Bollenbach v. United States, 326 U.S. 607, 614, 615, 66 S.Ct. 402, 406, 90 L.Ed. 350; Weiler v. United States, 323 U.S. 606, 611, 65 S.Ct. 548, 89 L.Ed. 495; Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356.[34]

The instructions under consideration must be viewed in light of the evidence that was before the jury and the trial theory of the respective parties.

At the outset, it may be said unequivocally that there was no evidence of fraudulent conduct on the part of the city officials or representatives of the Company with respect to the adoption of the conversion ordinance and when so viewed it is crystal clear that there was no fraud in the procurement of the conversion ordinance. A mere reading of the proceedings of the meetings antedating the conversion ordinance convinces that the involved parties were negotiating and bargaining in good faith and at arm's length. But fraud in the actual procurement or adoption of the ordinance was never an issue—no one contended that it was—and indeed the Government expressly disavowed any fraudulent conduct between the Company and the city. The Government's theory was, and this became a major issue, that Ossanna entered into an arrangement with the Isaacses whereby they would ostensibly discharge the obligations of the Company to the city under the franchise agreement then in effect, well knowing such arrangement would never be carried out; that Isaacs' company, American Iron, would never be called upon or required to discharge its obligations under the contract,

---

34. Bollenbach presented an unusual situation. The Government conceded that the instruction under attack was an improper declaration of the law but argued that "the sting of error is extracted because there was proof, other than the erroneous 'presumption', on the issue of Bollenbach's participation in the wrongdoing before the transportation of the stolen securities had ended. This is to disregard the vital fact that for seven hours the jury was unable to find guilt in the light of the main charge, but reached a verdict of guilty under the conspiracy count five minutes after their inquiry was answered by an untenable legal proposition. It would indeed be a long jump at guessing to be confident that the jury did not rely on the erroneous 'presumption' given them as a guide." 326 U.S. at p. 614, 66 S.Ct. at p. 406.

Yates is also clearly distinguishable in that the erroneous instruction went to the controlling law of the case.

In Weiler the court held it was prejudicial error on the facts of this case to refuse an instruction as to the quantum of proof required in a perjury case and thus is clearly distinguishable from the question under consideration. The court recognized that even as to such a basic proposition, it is not always prejudicial to refuse such an instruction, citing Goins v. United States, 4 Cir., 99 F.2d 147; Goins v. United States, 306 U.S. 622, 59 S.Ct. 461, 83 L.Ed. 1028; 323 U.S. at p. 611, 65 S.Ct. 548.

and that the Company would later of necessity be forced to further obligate itself to the city to secure removal of its property from the streets, to repave and otherwise improve the streets formerly occupied by Company property in order that the conversion program could actually be put into operation. It was in this factual setting that the Government contended that the adoption of the conversion ordinance was in fact a part of the scheme and device to defraud.

▮ In summary, the jury was entitled to give consideration to the question of whether the conversion ordinance was another facet of the scheme to defraud. The refused instruction would have completely removed this issue and any consideration thereof from the jury, hence the court's action in refusing to give it was not error.

▮ We recognize that the language used in the given instruction could have been more explicit, and that standing alone and without regard to the evidence and the theory adopted by the parties, it might be susceptible to the interpretation which appellants now place thereon. However, when considered in light of the issue that was litigated and what actually transpired, we are satisfied that it did not serve to misdirect the jury or submit an issue that was not supported by evidence.

Even assuming arguendo that the instruction did permit the jury to find that the conversion ordinance was procured by fraud, we are not convinced that such error was prejudicial. The appellants theorize that, absent this instruction, the jury could have found the contract between the Company and agreement for removal of the scrap was a bona fide

agreement and that the parties were in good faith recognizing and complying therewith and that the finding of fraud with respect to the scrap may have been predicated upon fraudulent procurement of the conversion ordinance for which there is no evidentiary support. Thus, in effect, appellants would have us assume that the jury found no fraud in the scrap transactions even though the evidence of fraud, quite apart from the ordinance, was substantial, and that it did find fraud in the procurement of the conversion ordinance where there was absolutely no evidence of fraud. Although we cannot speculate on what may have been the basis for the jury's verdicts, we are not required to indulge in the assumption that a jury that deliberated for five full days and returned verdicts which demonstrated a clear and understanding grasp of the evidence and the law, was a jury that lacked all common sense.

As we have seen, Ossanna, Larrick and Harry Isaacs were convicted of the substantive offenses of interstate shipments of property fraudulently obtained and they with Fred Isaacs and Jeffords were convicted of the conspiracy to commit the substantive offenses. The contention is now made by Ossanna, Larrick and the Isaacses that their rights were substantially prejudiced by the manner in which the interstate shipment counts were submitted to the jury. Specifically, it is asserted and argued that these alleged offenses should have been submitted as a part of the overall scheme and artifice to defraud the Company.[35] Additionally, these appellants also contend that the evidence was insufficient to justify a finding that the property transported was obtained by fraud, i. e., that the proper

---

35. Counts XIV, XV and XVI covered the interstate shipments of property fraudulently obtained but did not charge that these offenses were a part and parcel of the overall scheme to defraud. However, the Government in response to motions for bill of particulars did claim that the fraud in connection with the property that was the subject of these counts was committed in fulfillment of the

scheme and artifice which was alleged in the first count. During the trial the Government asserted that it was not necessary that a conviction under Counts XIV, XV and XVI be predicated on a finding that the offenses there charged were a result of the overall scheme. The trial court agreed and refused to submit the counts on that theory.

foundation was not laid in that respect. Ossanna and Larrick also argue that there was no evidence that they participated either directly or by concert in obtaining the property by fraudulent means or that they participated in the shipment thereof or derived any benefits therefrom.

■ In our view, it is unnecessary to consider or dispose of these claims of error. Firmly embedded in federal jurisprudence is the principle that a general sentence on several counts of an indictment will be sustained on appeal if the defendant was properly convicted under any count which is good and which is sufficient in itself to support the judgment and sentence. Barenblatt v. United States, 360 U.S. 109, 115, 79 S.Ct. 1081, 3 L.Ed.2d 1115; Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 2 L.Ed. 2d 321; Bunn v. United States, 8 Cir., 260 F.2d 313, 316; Guon v. United States, 8 Cir., 285 F.2d 140, 142.

■ The court imposed a general sentence on Ossanna, Larrick and Harry Isaacs on their convictions of Counts XIV, XV and XVI (interstate shipments) and XVII (conspiracy). The sentences thus imposed (four years imprisonment and $10,000 fine on Ossanna and Harry Isaacs, two years' imprisonment and $2,000 fine on Larrick) are within the limit of punishment authorized for conviction of conspiracy. Title 18 U.S. C.A. § 371.

We have demonstrated and held in our disposition of the main issue that there was substantial evidence to support the finding of an overall scheme and conspiracy, and the convictions of conspiracy. In this situation the complaining appellants were not prejudiced by the claimed erroneous submission of the interstate shipment counts.

Appellant Fred Isaacs contends that the trial court committed reversible error in refusing to strike certain testimony elicited from a Government witness.

Special Agent of the Internal Revenue Service, Judson H. Peterson, testified that on September 11, 1959, he and an other special agent called on Fred Isaacs, primarily for the purpose of obtaining a specimen of his handwriting. Apparently the agents were making an investigation with respect to income tax returns filed by Harry and Fred Isaacs. During the conversation Harry Isaacs, who was also present, refused to give a sample of his handwriting and stated that his attorney had instructed him to furnish records but to do no more than that. Then Fred Isaacs said something "about wondering why the Internal Revenue agents or Internal Revenue Service was investigating this case, and he mentioned something about newspaper publicity, * *. Then Fred went on to say, he said, 'Answer one question,' and he brought up, as he called it, a problematical case, 'Of a *company like ours that stole from the Transit Company a lot* but reported the profits, why is the Internal Revenue in on it?' He said, 'it's something for the stockholders.' * * * Then Harry Isaacs stated, 'We are not the only ones that got something from this company. How about that guy in St. Paul? How about Northern States Power?' Then he went on to say, 'Is it because it came out this fellow Blumenfield is in Mid-Continent?'" (Emphasis supplied) Following this testimony the court recessed for a brief period, and upon proceedings being resumed, counsel for Harry Isaacs moved the court to strike Peterson's testimony to the effect that Harry Isaacs had refused to talk, but no motion was made to strike Peterson's testimony relating to Fred Isaacs nor was any objection registered with respect to the alleged statement by Fred Isaacs. To the contrary, counsel for the latter cross-examined Peterson at some length in regard to the statement and attempted to establish that the statement was hypothetical in character and further that Fred Isaacs was very cooperative during the interview. On re-direct examination the statement was again explored by Government counsel, at which time counsel for Harry and Fred Isaacs made this objection: "Objected to as not proper re-direct examination, Your Honor; rep-

etition." Peterson's testimony completed the proceedings for the day, and the next morning, for the first time, counsel for Fred Isaacs moved the court to strike the italicized portion of Peterson's testimony on the ground that the statement attributed to Fred was hypothetical in nature and could not under any circumstances be regarded as an admission against interest. The motion was denied and error is now assigned because of the court's action in that respect.

■■■■ The state of the record brings into question the reviewability of the assignment now urged upon us. The rule is firmly settled that objections to evidence should be made as soon as it is apparent that the evidence is for any reason objectionable. This rule, of course, has a very salutary purpose. It affords the trial court an opportunity to act promptly in an effort to remove from the jury's consideration evidence which for any reason has no place in the lawsuit. We were confronted with a similar situation in Marx v. United States, 8 Cir., 86 F.2d 245, and there laid down the rule in this language (86 F.2d at p. 251):

"Again, it is noted that the testimony at which the motions are directed was for the most part admitted without objection, and the grounds for objection thereto were as apparent when the evidence was offered as at the close of the testimony. Counsel could not be permitted to sit idly by and permit the witnesses to testify, possibly hoping that his client might benefit thereby, and then, finding that the testimony was not beneficial, move to strike it out. Such a practice cannot be tolerated. It is only when evidence apparently admissible when offered is shown by subsequent developments to be inadmissible that the objection may be made in the form of a motion to strike out or by a request for an instruction that its effect be limited or that it be withdrawn from the consideration of the jury. St. Louis & S. F. R. Co. v. Duke (C.C.A.8) 192 F. 306. Ordi-

narily, an objection to the introduction of testimony must be made at the earliest possible opportunity after the ground of objection becomes apparent, or it will be held to have been waived, and a motion to strike out objectionable testimony must be made at the time the testimony is given if the ground of objection to it is then apparent."

The Marx case was cited with approval and followed by the Sixth Circuit in Metcalf v. United States, 195 F.2d 213, 216, where it is stated:

"It is the well settled rule that objections to evidence should be timely made when the evidence is offered, and that it is within the discretion of the trial judge to sustain or overrule a motion, delayed until the close of the Government's case, to strike from the consideration of the jury evidence previously received without objection,"

and by the Second Circuit in United States v. Parnes, 210 F.2d 141, 143. Thus the question to be resolved is whether under the circumstances of the situation we may now properly say the trial court abused its discretion in denying the motion to strike. It can hardly be gainsaid that if the statement of Fred Isaacs was an admission against interest, which is the position of the Government, then by all rules of evidence it was clearly admissible. See Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101; On Lee v. United States, 343 U.S. 747, 756, 72 S.Ct. 967, 96 L.Ed. 1270; Segal v. United States, 8 Cir., 246 F.2d 814, 818, cert. den. 355 U.S. 894, 78 S.Ct. 269, 2 L.Ed.2d 192; Hill v. United States, 9 Cir., 261 F.2d 483, 489; Moreland v. United States, 10 Cir., 270 F.2d 887, 890; 22A C.J.S. Criminal Law § 730; Wigmore on Evidence, 3 Ed. Vol. 4, § 1050.

■■■ Considering the circumstances under which the statement was made— the fact that Fred Isaacs knew that he was a suspect and that income tax returns with which he was connected were being investigated; that he was told by

the special agents that they took cognizance of other federal offenses, we are inclined to view the statement under question as an admission against interest and properly admissible. In any event, having in mind that the evidence of fraudulent conduct on the part of Fred Isaacs with respect to the scrap transactions was substantial, if not overwhelming, we are unable to perceive of any prejudice flowing from the court's refusal to strike the testimony.

The final assignment of error common to all appellants is that the Assistant United States Attorney in closing or rebuttal argument was guilty of such deliberate, repeated and flagrant misconduct as to seriously prejudice their right to a fair trial. We shall review the circumstances pertinent to this contention.

The arguments of counsel consumed a total of five days. All of July 25, 1960 and a portion of July 26 was required by Mr. Clifford Janes, Assistant United States Attorney, in presenting the opening argument for the Government. Counsel for defendants (five in number) presented their arguments on July 26 through July 28. Mr. Hyam Segell, Assistant United States Attorney, made the rebuttal argument which is the subject of attack and consumed all of July 29 in doing so. Not a single objection was made or voiced by any of the attorneys during the course of Mr. Segell's argument. However, after the conclusion thereof approximately sixty exceptions were taken by appellants' counsel. Judge Nordbye duly considered the exceptions and in his charge specifically instructed the jury to disregard certain portions of Mr. Segell's argument.

During oral argument, we were told that in failing to make any objection during the course of the claimed prejudicial remarks counsel for appellants followed the custom or practice which has prevailed in the United States District Court for the District of Minnesota apparently since our opinion in London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325, 338–344.[36] That case was decided in 1936 and prior to the effective date of the Federal Rules of Civil Procedure in 1938, 28 U.S.C.A., and the Federal Rules of Criminal Procedure in 1946, 18 U.S.C.A. However, subsequent to the adoption of the rules we stated in another civil case, Chicago & N. W. Ry. Co. v. Green, 8 Cir., opinion filed October 27, 1947, 164 F.2d 55, at p. 64:

> "A party is not entitled as a matter of right to seek a reversal for improper argument to the jury, where he fails to make objections during its course *or to take exceptions promptly at its close.*" (Emphasis supplied).

Our attention has not been directed to a criminal case where we had occasion to deal with the question and independent research fails to disclose that we have considered the matter. Other circuits have spoken on the subject. The Second Circuit held by implication, if not directly, that Rule 51, Federal Rules of Criminal Procedure (same as Rule 46, Federal Rules of Civil Procedure) contemplates that the objection should be made at the time of the improper argument. In United States v. Kyle, 2 Cir., 257 F.2d 559, cert. den. 358 U.S. 937, at p. 564, 79 S.Ct. 327, 3 L.Ed.2d 308, that Court stated:

> "What defendants now characterize as 'inflammatory and personal vituperation' and a 'heated appeal to passion' by the prosecutor on summation apparently failed to stir ei-

---

36. We note, however, in Fred Issacs' brief, this statement appears: "At the outset, the prosecutor carefully forestalled any challenge by defense counsel or possible rebuke by the trial court during the course of his argument, by blandly assuring the jury that 'it is a courtesy among lawyers not to interrupt each other in final argument.' *The supposed custom is not evidenced by the record (and was, indeed, unknown to other counsel),* but defense counsel could not threafter object to any misstatement during the course of the argument without incurring the risk of offending the jury." (Emphasis supplied).

ther of them or their counsel *at the time* of the utterances into voicing an objection or a request for a direction from the court. Rule 51, Fed. R.Cr.P., 18 U.S.C.A." (Emphasis supplied).

Even before the rules were adopted, the Seventh Circuit, in Paschen v. United States, opinion filed April 12, 1934, 70 F. 2d 491, at p. 502, made this observation:

" * * * the ordinary method for undertaking to keep overenthusiastic counsel within fairly reasonable bounds is to call the court's attention from time to time to alleged departures, and to procure from the court a ruling and direction with reference thereto. It does not appear that *at any time during* the argument objection was made to the things now urged as error, and we do not find these so palpably improper as would justify us in taking notice of them without timely objection, and thus to give opportunity for correction, if correction is necessary." (Emphasis supplied).

In United States v. Socony-Vacuum Oil Co., 310 U.S. 150, at p. 240, 60 S.Ct. 811, 852, 84 L.Ed. 1129, opinion filed May 6, 1940, the question was not an issue, but we note that the Court did state:

"Under the second of these objections, respondents complain of the plea to the jury not to 'let your Government and the United States and its citizens and society down', and that government counsel 'believe to the bottom of their hearts in the justice of the cause that they espouse here'. No objection *at that time* was made by defense counsel." (Emphasis supplied).

■ In a situation where, as here, the claim is made that the prosecutor engaged in making repeated prejudicial statements to the jury throughout his argument and from the inception thereof, we believe the better practice is to make objection at the time of the asserted prejudicial utterances. This will afford the court an opportunity to properly warn the prosecutor that improper argument will not be tolerated, and to promptly take action designed to more effectively remove from the minds of the jury the sting or poison of the prejudicial statement. This is the practice that has been adhered to in a number of criminal cases. See and compare Mellor v. United States, 8 Cir., 160 F.2d 757, 765, cert. den. 331 U.S. 848, 67 S.Ct. 1734, 91 L.Ed. 1858; Myres v. United States, 8 Cir., 174 F.2d 329, 338, cert. den. 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520; Greenberg v. United States, 1 Cir., 280 F.2d 472, 474; United States v. Spangelet, 2 Cir., 258 F.2d 338, 342; Weathers v. United States, 5 Cir., 117 F.2d 585, 586; Henderson v. United States, 6 Cir., 218 F.2d 14, 21, 50 A.L.R. 2d 754, cert. den. 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253.

Since it is apparent that all of the parties and the court regarded what transpired as being sufficient to preserve the right of appellants to have the argument to which exceptions were taken reviewed on appeal, we have proceeded accordingly.

■ While the propriety of the argument of Government counsel in criminal prosecutions has been the subject of consideration in many cases, no exact or precise test or standard may be applied to all situations. The dominating question, always, is whether the argument complained of was so offensive as to deprive the defendant of a fair trial. It is not amiss for us to again point out that in a criminal case, the United States Attorney has imposed upon him a high and important responsibility. He should present the Government's case with vigor and earnestness, and use all legitimate means to bring about a just conviction, but, likewise, he must refrain from indulging in tactics or methods calculated to produce an unjust conviction. In Berger v. United States, 295 U.S. 78, at p. 88, 55 S.Ct. 629, at p. 633, 79 L.Ed. 1314, heavily relied on by appellants, the Supreme Court gave this admonition:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern

impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

While the "improper methods" test is broad in its meaning, " * * * each case necessarily turns on its own facts." United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at p. 240, 60 S.Ct. 811. Thus, we are required to determine whether in light of all the facts and circumstances, with particular emphasis on all of the arguments, the utterances complained of so influenced the jury as to bring about an unjust conviction.

 We deem it unnecessary to enumerate and discuss the numerous objections to Mr. Segell's argument. It is sufficient to say that the alleged prejudicial remarks may be characterized, generally, as being—one, outside the record and beyond the scope of the record; two, defamatory and derogatory of defendants and their counsel, and three, personal opinion and belief of guilt of the defendants. In reaching our conclusions, it should be kept in mind that we are permitted to examine "only the cold print of the record, and therefore should weigh carefully the findings of the trial judge, who saw and heard the actual events, and found no prejudice. See United States v. Holt, 7 Cir., 1939, 108 F.2d 365 and Tuckermann v. United States, 6 Cir., 1923, 291 F. 958, 959." Orebo v. United States, 9 Cir., 293 F.2d 747, at p. 749. We have nonetheless meticulously examined and analyzed all arguments and have independently concluded that the utterances complained of, when viewed in context and in light of all circumstances, were not calculated and designed to produce an improper conviction and did not in fact have that effect. Judge Nordbye was of the opinion that Mr. Segell's argument in some respects went beyond the bounds of propriety, and specifically instructed the jury to disregard the improper statements.[37]

37. In summary, the court instructed the jury that there was no evidence to support Mr. Segell's statement that the case was comparable to the fraud case of one Wilbur Foshay and the jury was instructed to disregard that statement; that there was no evidence to support Mr. Segell's statement that there was any money fraudulently passing back and forth between or among the defendants from the Jeffords commission transaction, or the Isaacs scrap transaction or the Francis commission payment; that any comment by Mr. Segell as to the position occupied by the defendants and their attorneys in the court room during the trial was without significance and any reference thereto was to be disregarded by the jury; that "(c)ounsel sometimes refer to their own personal opinions, or their own views or their own knowledge in their arguments. Well, unless such opinion or views or knowledge are based upon the evidence, they will, of course, be disregarded by you." The jury was instructed to disregard the statement by Mr. Segell to the effect that certain counsel for defendants during their arguments had "inspirational moments of truth." In this connection, the court stated to the jury: "I rather think Mr. Segell was indulging in some flights of oratory in using that expression, and he made use of it with reference to the arguments of Mr. Dienard and Mr. Smith. Well, in any event, such statements must not be taken by you as any reflection on the manner in which either of these counsel have conducted their defense, or as having any bearing upon the sincerity of the arguments which these lawyers have made in behalf of their clients." During his argument Mr. Segell referred to Mr. Jeffords as a "pathological liar." The court stated to the jury that "There is no evidence to sustain that statement, and that argument will be disregarded by you."

738

■ We cannot escape the conclusion that most of the objections to the argument resulted from hypercritical counsel who were, as aptly stated by Judge Nordbye, "overly sensitive" and who "with microscopic captiousness, find fault with the most innocuous statements of government counsel." We are mindful that prior to the commencement of arguments the trial of this case had consumed 63 working days. It was a bitterly fought contest with no quarter being asked and none being given by either side. " * * (S)ome latitude must be given to lawyers' language in a hard fought case." United States v. Kravitz, 3 Cir., 281 F.2d 581, 586, cert. den. 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372. "In the heat of oral arguments and summations counsel sometimes use language they would not have used under less trying circumstances, and in order for such comment to constitute reversible error the language used must have been plainly unwarranted and clearly injurious. La Feber v. United States, 8 Cir., 59 F.2d 588." Mellor v. United States, 8 Cir., 160 F.2d 757, 765, cert. den. 331 U.S. 848, 67 S.Ct. 1734, 91 L.Ed. 1858. It is, of course, well settled that counsel for the Government is accorded the privilege of arguing to the jury all possible inferences which reasonably flow from the evidence. Kempe v. United States, 8 Cir., 160 F.2d 406, 411, cert. den. 331 U.S. 843, 67 S.Ct. 1534, 91 L.Ed. 1864; Mellor v. United States, supra, 160 F.2d at p. 765, cert. den. 331 U.S. 848, 67 S.Ct. 1734, 91 L.Ed. 1858; Gray v. United States, 8 Cir., 14 F.2d 366, 367.

It also appears that portions of the argument said to be prejudicial were motivated by statements made by defense lawyers in their arguments and consequently fall within the rule that prejudicial error does not result from improper remarks in closing arguments invited or provoked by opposing counsel. Myres v. United States, 8 Cir., 174 F.2d 329, 339, cert. den. 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520; Brennan v. United States, 8 Cir., 240 F.2d 253, 263–264, cert. den. 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 723.

In the final analysis the question before us is not whether Mr. Segell's argument was in certain respects beyond the bounds of propriety and improper, but whether it was prejudicial and prevented the jury from exercising freedom of judgment and thought in its deliberations. Of vital, if not decisive, importance is what transpired after the so-called prejudicial argument was delivered. The jury received the case at 5:30 p.m. on August 1, 1960, and deliberated until the morning of August 6 when the verdicts were returned. Defendant Blumenfield, who was the subject of some of the challenged argument, and whom the Government was manifestly interested in convicting, was acquitted by the jury.[38] Defendants Ossanna, Larrick and Isaacs were also acquitted of certain counts of the indictment. The sum total of the result demonstrates convincingly that the jury adhered to the court's admonition "to analyze and weigh all of the testimony you have heard so as to enable you to determine intelligently the factual issues which will be submitted to you. Then you are to apply the law which the Court gives to you to the facts as you may find them to be from the evidence so that justice may be done between the Government and these defendants." Certainly the time consumed in deliberating and the verdicts that were returned indicate unusual discernment on the part of the jury and should dispel any feeling that it was improperly influenced, prejudiced or misguided by anything that was said by Government counsel. The gross misconduct of the prosecutor in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, renders that case inapposite. There, improper cross-examination was resorted to in that the prosecutor among other things assumed prejudicial facts not in evidence, bullied and argued with witnesses and in general

38. Defendant Blumenfield was convicted of a Mann Act (18 U.S.C.A. § 2421 et seq.) violation in the United States District Court for the District of Minnesota and his conviction was affirmed by this court. Blumenfield v. United States, 284 F.2d 46, cert. den. 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed. 692.

conducted himself in a "thoroughly indecorous and improper manner." (p. 84, 55 S.Ct. p. 631) This infraction was compounded by an argument which the Supreme Court regarded as "pronounced and persistent." (p. 89, 55 S.Ct. p. 633) In reversing, the court looked beyond the improper conduct and concluded that "* * * [T]he case against Berger * * * may properly be characterized as weak—depending, as it did, upon the testimony of Katz, an accomplice with a long criminal record." 295 U.S. 78, at p. 89, 55 S.Ct. p. 633. Significantly, the court also stated, at p. 89, 55 S.Ct. p. 633: "If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might be reached." Here, there is no claim or suggestion that either of the Assistant United States Attorneys who prosecuted the case engaged in conduct during the trial which transgressed upon the rights of appellants and, unlike Berger, we cannot characterize this as a weak case. To the contrary, there was substantial and cogent proof pointing to the guilt of appellants.

The Supreme Court of the United States was again concerned with the argument of Government counsel in United States v. Socony-Vacuum Oil Co., supra. As a reading of the opinion discloses, 310 U.S. pp. 238–243, 60 S.Ct. 811, counsel for the Government engaged in an argument which the Court regarded as "undignified and intemperate" and not comporting

> "with the standards of propriety to be expected of the prosecutor. But it is quite another thing to say that these statements constituted prejudicial error. In the first place, it is hard for us to imagine that the minds of the jurors would be so influenced by such incidental statements during this long trial that they would not appraise the evidence objectively and dispassionately. In the second place, this was not a weak case as was Berger v. United States, 295 U.S. 78 [55 S.Ct. 629, 79 L.Ed. 1314], where this Court held that prejudice to the accused was so highly probable as a result of the prosecutor's improper conduct 'that we are not justified in assuming its non-existence.'" 310 U.S. at p. 239, 60 S.Ct. at p. 852.

The Court's concluding remarks and observation on the subject of alleged improper argument are apropos here: "'If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand.'" 310 U.S. at p. 243, 60 S. Ct. at p. 853.

Anent the claim of procedural errors, the record attests to the patience and judicial poise maintained by the experienced and distinguished jurist who presided over the trial. His rulings demonstrate understanding, fairness, impartiality and wisdom. Both the Government and the appellants were represented by able, experienced and vigorous trial lawyers. The record is replete with objections, motions, etc., and in every instance where necessary Judge Nordbye accorded all parties a full opportunity to be heard before ruling. While it is extremely difficult, if not impossible, for a trial of this nature to be conducted without error of some degree, we are convinced that none of the court's rulings was prejudicial, and that appellants were given a fair trial.

The judgments are

Affirmed.